UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-22115-BLOOM/Reid

ROBERT GERING,

      Petitioner,

v.

CHAD POPPELL, Secretary,
Florida Department of Children
and Families,

      Respondent.
_____/

## ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

**THIS CAUSE** is before the Court upon Petitioner Robert Gering's Petition for Writ of Habeas Corpus pursuant to 22 U.S.C. § 2254, ECF No. [1] ("Petition"). Respondent filed a response in opposition, ECF No. [16] ("Response"), to which Petitioner filed a traverse in reply, ECF No. [28] ("Reply"). The Court has carefully considered the Petition, the Response, the Reply, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, the Petition is denied.

## I.       BACKGROUND

Petitioner challenges the constitutionality of his civil commitment under Florida's Jimmy Ryce Act, entered following a jury trial in Miami-Dade County Circuit Court, Petition No. 2015-009809-CA-01. Construing his arguments liberally as afforded *pro se* litigants, pursuant to *Haines v. Kerner*, 404 U.S. 519, 520 (1972), Petitioner raises a single ground for relief: his liberty interest under the Fourteenth Amendment and his constitutional right to a jury trial in a civil commitment

case were violated when the trial court granted the State's motion for directed verdict without submitting the case to the jury. *See* ECF No. [1] at 5.

### A.     The Jimmy Ryce Act

The Jimmy Ryce Act (the "Act") went into effect on January 1, 1999 and is formally titled "Involuntary Civil Commitment of Sexually Violent Predators." *See* Fla. Stat. Ch. 394, Part V. Under the Act, a person who meets the statutory definition of a "sexually violent predator" ("SVP") may be involuntarily committed for long-term treatment and care.

The Act defines an SVP as any person who "[h]as been convicted of a sexually violent offense *and* who "[s]uffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." Fla. Stat. § 394.912(10). The legislature intended to "create a civil commitment procedure for the long-term care and treatment of sexually violent predators," because it found that existing provisions for the commitment of the mentally ill were insufficient to address the particular needs and dangers presented by SVPs. Fla. Stat. § 394.910.

Civil commitment proceedings are normally commenced when the State Attorney files a petition for commitment, which then triggers a state court to determine whether there is probable cause to determine that the individual is an SVP. Fla. Stat. § 394.915(1). If the court finds probable cause exists, the individual may be held in custody pending a final determination of whether the individual is subject to civil commitment. Fla. Stat. § 394.915(5).

Before the state civilly commits an individual, that person has the statutory right to a jury trial. Fla. Stat. § 394.916(1) and (5). The individual also has the right to the assistance of counsel and to present experts, and if the person is indigent, he or she may receive these services at no cost. *See* Fla. Stat. §§ 394.916(3) and (4). At trial, if it is determined "by clear and convincing evidence,"

either by the court or a unanimous jury, that the individual is an SVP, then he or she is "committed to the custody of the Department of Children and Family Services for control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." Fla. Stat. §§ 394.917(1) and (2).

Thereafter, the Act mandates review of the detainee's mental condition at least once a year, "or more frequently at the court's discretion," to determine whether the detainee continues to qualify as an SVP. *See* Fla. Stat. § 394.918(1). After each annual mental health status review, a court must hold a "limited hearing" to determine whether there is probable cause to believe the detainee is safe to be at large. *See* Fla. Stat. § 394.918(3). If probable cause is found, then the case is set for a non-jury trial, at which time the State continues to bear the burden of proving by clear and convincing evidence that the detainee still qualifies as an SVP. *See* Fla. Stat. §§ 394.918(3) and (4). However, if the State fails to meet its burden, the detainee is released from custody. *Id.*

### B.    Procedural history[1]

#### 1.    Pre-trial proceedings

In 1986, in New York Case Number 86-A6957, Petitioner was charged with burglary and rape of an elderly woman. ECF No. [17-1] at A. 1. He was convicted and sentenced to a term of 5 to 15 years in state prison. *Id.* at A. 2. Petitioner was released on supervision but absconded to Florida. *Id.* at A. 3.

In Miami-Dade, Florida Case No. F97-23950, Petitioner was charged by amended information with lewd and lascivious battery on an elderly person, battery on an elderly person, and kidnapping. *Id.* at A. 6. After a jury found Petitioner guilty, he was sentenced to a total of 25

---

[1] Unless otherwise noted, the facts presented in the Background section are taken from the Response, ECF No. [16]. Petitioner does not significantly dispute these facts but rather raises a legal argument regarding his right to a jury trial in civil commitment proceedings. ECF No. [28].

years' imprisonment. *Id.* at A. 7, 8. The sentence was ordered to run concurrent to his existing sentence in the New York case. *Id.* at A. 9. Petitioner then sought direct appellate review, and Florida's Third District Court of Appeal ("Third DCA") *per curiam* affirmed Petitioner's judgment of conviction. *Id.* at A. 11; *see also Gering v. State*, 746 So.2d 580 (Fla. 3d DCA 1999). The Florida Supreme Court denied review. ECF No. [17-2] at A. 13.

In 2015, in Miami-Dade Civil Case No. 2015-09809-CA-01, prior to the expiration of Petitioner's Florida sentence, the State Attorney filed a petition to have the Petitioner involuntarily civilly committed as an SVP under the Act "for control, care and treatment until such time as the [Petitioner's] mental abnormality or personality disorder has so changed that it is safe for [Petitioner] to be at large." ECF No. [17-2] at A. 26.

Petitioner, through counsel, moved to dismiss the petition, arguing that involuntary civil commitment was facially unconstitutional for restricting his fundamental liberty right under the Fourteenth Amendment. ECF No. [17-4] at A. 36. The trial court denied the motion. After Petitioner's bench trial resulted in a mistrial, *id.* at A. 38, and the trial judge entered an order of recusal, *id.* at A. 41, Petitioner demanded a jury trial, *id.* at A. 43, which trial was held in February 2016.

### 2.    Evidence presented at Petitioner's jury trial

The State presented two witnesses, Drs. Jeffrey Musgrove and Sheila Rapa, at the jury trial. Dr. Musgrove testified that he examined Petitioner prior to trial, found that he met the criteria necessary for civil commitment, and that he would likely commit another sexually violent offense if not confined for treatment. T. 5 at 268, 308-09, 381-90.[2] Dr. Musgrove diagnosed Petitioner as

---

[2] For ease of reference, the Court cites to each part of the trial transcript, ECF No. [18], as "T. __" for the volume of the transcript followed by the page number. Trial transcripts 8 and 9, ECF Nos.

suffering from sexual sadism disorder, paraphilia, an antisocial personality disorder, a depression condition, and stimulant use disorder. *Id.* at 308, 383-85.

Through Dr. Musgrove, the State introduced facts surrounding Petitioner's criminal convictions. Petitioner was 21 years old when, in the New York case, he went to the 83-year-old victim's home and awoke her to tell her that he left a wrench downstairs with the boiler. T. 7 at 552; T. 5 at 320-21. She opened the door, Petitioner pushed her to the floor, pulled her hair, and said he wanted to have sex. T. 5 at 321. Her screams drew her 70-year old sister, whom Petitioner pulled into a bedroom and raped. *Id.* Petitioner stopped, went to the refrigerator, and got a drink of alcohol, which Dr. Musgrove found "clinically disturbing." *Id.* at 324, 330. Petitioner thereafter told them not to call the police. *Id.* at 321. Dr. Musgrove found that Petitioner showed predatory violent planning. *Id.* at 327. Dr. Musgrove believed this showed Petitioner had an antisocial structure. *Id.* at 330. After Petitioner completed his New York prison sentence, he was placed on parole, ordered to go to treatment, sex offender treatment, and drug treatment. *Id.* at 332. Petitioner received advanced sex offender treatment in the community. *Id.* at 334. Petitioner violated New York parole or probation four times. *Id.* at 334, 423. Petitioner returned to New York but to avoid returning to jail he came to Miami. *Id.* at 337. Petitioner did not tell Dr. Musgrove about his violations or absconding from supervision. *Id.* at 334-35. Minimizing his continued violations of rules indicated an antisocial personality disorder. *Id.* at 335, 337.

In Miami Beach, Petitioner assumed a different name and became a handyman at an elderly apartment building. *Id*. at 337-38. At this time, Petitioner was 31 or 32. *Id.* at 364. The 89-year-old female victim, who used a walker, responded to Petitioner's flyer advertising his handyman

---

[18-11]; [18-12]; and [18-13], contain portions of the trial transcribed directly into the appellate record, and therefore, those pages are cited to their record citations as "R. __."

services. *Id.* at 340. Petitioner went to the victim's home at night to fix her blinds. *Id*. Petitioner

picked her up from her chair and dragged her into the bathroom. *Id.* He undressed her, tied her

hands behind her back, and gagged her. *Id.* at 340-42. The victim went limp and played dead. *Id.*

at 341. She suffered heavy bruising on her face and mouth. *Id.* at 346. Petitioner told the victim

that he was going to have sex with her, but instead got high and left. *Id.* at 340. Petitioner returned

to New York. *Id.* at 359. Petitioner changed his name on his birth certificate, which suggested an

antisocial attempt to elude discovery. *Id.* at 360-61.

Dr. Musgrove found it significant that: Petitioner used humiliating force with an elderly

victim who could not fight back, *id.* at 343, 437; he initiated the contact with the victim late at

night, *id.* at 354; and the act was sexual. *Id.* at 358. Dr. Musgrove rejected the suggestion that

Petitioner left out of remorse. *Id.* at 438.

Dr. Musgrove testified that Petitioner's sexual sadism disorder was "powerful" in that it

persisted ten years after the first victim, and after treatment and parole, leading to Petitioner

attacking the last victim in Florida. *Id.* at 309. Dr. Musgrove's report was introduced into evidence.

Dr. Musgrove found the elderly age of Petitioner's victims and use of needless force during the

attacks to be significant. *Id.* at 323. Dr. Musgrove also found it significant that Petitioner found

arousal in humiliation, brutalization, and the fear of the victims. *Id.* at 324.

Dr. Musgrove met with Petitioner in 2014. *Id.* at 292-93. They discussed the New York

case, which Petitioner minimized by not owning up to the fact that he struck or upset the victims.

*Id.* at 326. After receiving treatment, Dr. Musgrove opined that Petitioner should have been able

to talk honestly without diminishing his culpability and responsibility, but he did not. *Id.* at 328.

They also discussed the Florida case. *Id.* at 347. Petitioner minimized that victim's role and

contradicted her version of events. *Id.* at 347, 355, 363. Petitioner blamed the attack on doing drugs

and his father leaving him. *Id.* at 364-65. When Petitioner was deposed in 2015, he believed that his actions were caused by intoxication. *Id.* at 373. Dr. Musgrove found Petitioner's lack of empathy toward the victim, even after undergoing sex offender treatment, to be significant. *Id.* at 365. Petitioner's pathology, a compulsion to have inappropriate and sexually violent contact with elderly women, remained between the New York and Florida cases, despite the punishment, treatment, and supervision that Petitioner received from the New York case. *Id.* at 379.

Dr. Musgrove cited to a 2016 incident report from the Florida Civil Commitment Center for Petitioner's behavior at a court hearing as indictive of difficulty in regulating his emotions and behavior, and antisocial behavior. *Id.* at 385, 389.

Dr. Musgrove scored Petitioner on an assessment instrument, the Static 99R, at a low moderate score for likelihood to reoffend. *Id.* at 392-93. But Dr. Musgrove felt that Petitioner's sexual sadism was very rare, and attributed Petitioner's low score to being incarcerated most of his life without access to victims. *Id.* at 393. Dr. Musgrove felt that hypothetically, if the Static 99R had been administered to Petitioner after his New York case, he would have had a low score then as well. *Id.* at 394. Dr. Musgrove used the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") to diagnose Petitioner. T. 6 at 452. Petitioner's counsel cross-examined Dr. Musgrove about the Static 99R, and about the SVP review report's analysis regarding the Static 99R test, which according to the report, "contributed mildly to the overestimation" of the likelihood of re-offending. *Id.* at 481, 488. Dr. Musgrove explained that the Static score is part of the evaluation, but not wholly determinative. T. 7 at 540, 545.

Dr. Musgrove identified aggravating risk factors that correlated to a clearer picture of Petitioner T. 5 at 394-95: his behavior after his treatment for the New York case, *id.* at 395; and his enabling social community support that led to relapse. *Id.* at 396, 398. Dr. Musgrove identified

mitigating factors: Petitioner's family; and the remaining 3.5 years of conditional release supervision from his New York case. *Id.* at 398. Dr. Musgrove testified that Petitioner's release would place the elderly community of South Florida at risk. *Id.*

The defense cross-examined Dr. Musgrove about the SVP review report, which was introduced into evidence during trial. T. 6 at 462. The report identified physical components of sexual sadism and listed sadistic behaviors that were markers for psychological terror imposed by sexual sadism, but those listed behaviors were not exhaustive or required to find sexual sadism. *Id.* at 465; T. 7 at 523. Dr. Musgrove also explained that drugs and alcohol did not cause sexual sadism. T. 7 at 525. Dr. Musgrove testified that the report did not apply to Petitioner. *Id.* at 543-44, 549. Instead, it was feedback for the program's in-house team. *Id.* at Tr. 549.

Next, Dr. Sheila Rapa testified that she was asked to participate when Dr. Kevin Raymond, who had already prepared an evaluation report, could not make it to trial. T. 7 at 560, 569, 571.

Dr. Rapa diagnosed Petitioner under the DSM-5 with sexual sadism disorder, in a controlled environment, unspecified depressive disorder, anti-social disorder, and stimulant use disorder in a controlled environment. *Id.* at 578, 632, 640. Petitioner met the SVP criteria. *Id.* at 579, 632. Dr. Rapa opined that Petitioner met the factors for civil commitment in that: he was convicted in two cases involving sexually violent or sexually motived offenses, *id.* at 632-38; he suffers from a mental abnormality of sexual sadism disorder, *id.* at 639-40, and that sexual sadism disorder is incurable and does not go away over time, *id.* at 643; Petitioner has an antisocial personality disorder, *id.* at 643-45; and his mental abnormality or personality disorder predisposed him to commit future acts of sexual violence if he was released to the community and was a menace to the safety of community and others. *Id.* at 633, 647-48.

Dr. Rapa met with Petitioner in 2015. *Id.* at 573. Dr. Rapa described the meeting as ordinary, yet Petitioner told another doctor that Dr. Rapa was "seductive in the interview" and that she was physically hanging out of her clothing during the interview at the jail. *Id.* at 579, 581. Dr. Rapa showed the jury she wore what she called her "jail sweater." *Id.* at 581. Petitioner told Dr. Rappaport that Dr. Musgrove, who also interviewed Petitioner, was flamboyantly gay. *Id.* Dr. Rapa found Petitioner's comments unusual and indicative that Petitioner was sexually preoccupied even with the doctors evaluating him for civil commitment: "[i]t is concerning of somebody who could be out in the community and thinking about sex even with professionals that he came into contact with." *Id.* at 581-82.

Petitioner discussed his New York case with Dr. Rapa, but described the sex was consensual and the elderly victim receptive to sex with him. T. 7 at 596. Petitioner also told his parents that the sexual encounter in the New York case was consensual. *Id*. at 597. Petitioner downplayed the violence to Dr. Rapa, which Dr. Rapa found concerning because Petitioner had already been in sex offender treatment. *Id.* at 598.

Petitioner told Dr. Rapa that he received sexual abuse treatment and substance abuse treatment in New York. *Id*. at 599. Petitioner stated that he violated probation by testing positive for cocaine. *Id.* at 600. He was placed in residential rehabilitation, but relapsed and fled to Venice Beach, California, and San Francisco, California. *Id*. From California, Petitioner wanted to head towards Canada, but he could not cross the border due to a terrorist attack. *Id.* at 601. Eventually, Petitioner returned to New York and surrendered. *Id*. In New York, Petitioner continued to use drugs, and then he got a DUI, which garnered another parole violation. *Id.* at 602, 608. He fled to Florida under an alias, which indicated an attempt to evade consequences. *Id.* at 601-02.

When released from commitment, Petitioner planned to live with his mother and step-father in Fort Myers, Florida, which was a community where most people are over the age of 65. *Id*. at 609, 617, 619. The defense clarified that Petitioner's parents did not live in a senior community. T. 8 at R. 646. Dr. Rapa found Petitioner's post-release plan to be imprudent. T. 7 at 620.

Dr. Rapa opined that Petitioner had a history of failing to follow supervision, notably incurring a new sex crime in Florida while on supervision from New York for a prior one. *Id*. at 610, 621. This indicated that Petitioner does not do well with courts, rules, mandates, or sanctions. *Id*. at 621. Dr. Rapa also did not believe that drugs or alcohol caused sexual offenses; while those substances can lower inhibitions, they do not lead to violence. *Id*. at 619.

Dr. Rapa completed a Static 99R for Petitioner. *Id*. at 621-23. Dr. Rapa treated the Static 99R as an information point, but she also considered all other information. *Id*. at 623-24. Dr. Rapa also was questioned about the SVP review report study. T. 8 at R. 714. On re-direct, Dr. Rapa testified that it was a review of other offenders, studied from one year to five years, and was not specific for sexual sadism. *Id*. at R. 735-36.

Dr. Rapa considered that Petitioner's employment and non-threatening demeanor allowed him access to people's homes. T. 7 at 633. Dr. Rapa considered Petitioner to be manipulative to the extent that the victims in his profile could not detect dangerousness in him. *Id*. at 634. Dr. Rapa found the level of violence towards his elderly victims to be significant. *Id*. at 634, 636. Dr. Rapa considered it significant in the New York case that Petitioner was able to maintain sexual arousal. *Id*. at 635. Dr. Rapa did not consider substance abuse to be determinative because the victims still invited Petitioner into their homes. *Id*. at 634-35.

Petitioner did well while incarcerated, where in prison there are not many elderly people. T. 7 at 631. In his deposition, Petitioner claimed that there were elderly nurses on the volunteer

staff but he never had a desire to touch them. T. 8 at R. 725. Dr. Rapa investigated this claim by calling the Florida Civil Commitment Center and learned that there may have been one nurse on staff in her early 60s, but an inmate could not access her. *Id.* at 726.

Dr. Rapa considered mitigating factors. She did not find community control from the New York case to be a mitigating factor because he failed to comply with supervision. T. 7 at 649. She also did not find Petitioner's family support a mitigating factor because his family enabled him in the past. *Id.*

At the close of the State's case, the State filed a motion for directed verdict, arguing that no reasonable juror could find that Petitioner was unlikely to engage in acts of sexual violence if released; and the trial court deferred ruling. T. 8 at R. 737-38.

Petitioner called Dr. William Samek as a witness. *Id.* at R. 740. The State conducted a *voir dire* examination regarding his expert qualifications. *Id.* at R. 739. Dr. Samek testified about his background, education, and experience, *id.* at R. 740-41, his licenses and certifications, *id.* at R. 746-47, and his work for the Multi-Disciplinary Team until September 2000. *Id.* at R. 744. The State queried why Dr. Samek's CV stated that he held a position as a member of the Multi-Disciplinary Team from 1999 to the present. *Id.* at R. 749. Dr. Samek responded that it was an old CV, and had been changed, but agreed it was the CV that he provided to the State before his deposition. *Id.* at R. 749-50. Dr. Samek also said that until his deposition, the Multi-Disciplinary Team never told him that his contract had expired, and at the time of his deposition it was his opinion that he was a member of the team. *Id.* at R. 750, 752.

Dr. Samek previously testified in deposition that the sexually violent predator statute required somebody to have a mental disease. *Id.* at R. 756. By the time of trial, Dr. Samek reviewed the statute's requirement of mental abnormality and personality disorder—and Dr. Samek felt the

State was splitting hairs by raising his use of mental disease as the criteria. *Id.* For the statutory criteria that a person be likely to engage in acts of sexual violence if not confined, Dr. Samek defined likely to commit other sex offenses as more likely than not, and 51%, or over 50%. *Id.* at R. 757-60. Dr. Samek said the statute did not require consideration of the level of violence a person used in committing a sex offense, even though in the real world it must be considered. *Id.* at R. 759. Dr. Samek did not believe that the statute correlated level of violence to likelihood to offend. *Id.*

Dr. Samek did not know when the DSM-5 issued. *Id.* at R. 761. Dr. Samek agreed that the previous version was the DSM-4TR. *Id.* At the time of his report dated July 8, 2015, he was most comfortable using the DSM-4. *Id.* at R. 762. In deposition, he asked the prosecutor to use the DSM-4 because of his familiarity with it. *Id.* at R. 763. Dr. Samek diagnosed Petitioner with a condition that requires treatment, but that this cause for treatment was not a mental illness. *Id.* at R. 764, 766.

The State sought to exclude Dr. Samek from testifying as an expert. The State identified Dr. Samek's defining likely to reoffend as more likely than not, greater than 50%, as incorrect and would confuse the jury if he was allowed to offer an opinion as to whether Petitioner met criteria for commitment under the statute. *Id.* at R. 767. The State also sought to exclude Dr. Samek's expert opinion that the level of violence should not be considered toward likelihood because it was incorrect. *Id.* The State argued that Dr. Samek should not be allowed to offer expert opinion testimony because he did not know the current DSM. *Id.* at R. 768.

Ultimately, the trial court excluded Dr. Samek from offering expert testimony. *Id.* at R. 775-76. However, the trial court allowed Dr. Samek to testify regarding his meetings with Petitioner and the items they discussed. *Id.*

Nonetheless, Petitioner chose not to present any testimony from Dr. Samek. *Id.* at R. 777. Petitioner did not proffer Dr. Samek's excluded expert testimony into the record. Petitioner chose not to testify. *Id.* at R. 782. Petitioner did not call any other witnesses. Petitioner admitted the SVP review report into evidence. *Id.* at R. 778. Petitioner then rested.

### 3. State's motion for directed verdict and ensuing appellate proceedings

The State renewed its motion for directed verdict at the close Petitioner's case. The trial court granted the motion, noting the following:

> After hearing all of the testimony, seeing the evidence that has been submitted and hearing argument I don't see any conflicts in the evidence as to the testimony or testimony on behalf of the that could be provided that could be properly submitted to the jury, the testimony has been that Mr. Gering has been convicted of sexually violent offense, that he suffers from a mental abnormality and personality disorder and this mental abnormality or personality disorder makes him likely to engage in acts of sexual violence if not confined in a secure facility for long term, control, care and treatment.

> And I find that no reasonable juror following the law and considering the evidence can reasonably find that Robert Gering has not been convicted of sexual violent offense that he doesn't suffer from is mental abnormality or personality disorder and that the mental abnormality or personality disorder makes him not to engage in sexual violence if not confined in a secured facility.

T. 9 at R. 589.

Petitioner appealed the commitment order, arguing that the trial court judge denied his right to a jury trial by granting the State's motion for directed verdict because neither the statute nor the Act's rules of procedure authorized such a ruling. ECF No. [17-5] at A. 49. With the exception of a brief reference that the trial court's decision "arguably violate[d] *Apprendi v. New Jersey*, 530 U.S. 466 (2000)," Petitioner's entire claim rested on the interpretation of Florida state law and procedural rules. *Id.* The Third DCA affirmed the trial court's judgment in a written opinion. ECF No. [17-6] at A. 52; *see also Gering v. State*, 252 So.3d 334 (Fla. 3d DCA 2018).

Petitioner did not raise the federal constitutional issue raised here in his *pro se* motion to certify question to the Florida Supreme Court ECF No. [17-6] at A. 53, his motion for rehearing, *id*. at A. 54, or in his counsel's motion to adopt his *pro se* motion. *Id.* at A. 55. Rather, he merely argued in all three pleadings that the grant of the directed verdict violated his right to a jury trial under the Act and the Florida Constitution. After those motions were denied, *id*. at A. 58, and the mandate issued, *id.* at A. 59, Petitioner did not raise the federal constitutional issue raised here in his amended jurisdictional brief to the Florida Supreme Court, citing only to the Florida Constitution, the Act and Florida case law to support his argument. *Id*. at A. 66.

After Petitioner's request for review in the Florida Supreme Court was denied, ECF No. [17-7] at A. 71, Petitioner filed a petition for writ of certiorari in the Supreme Court of the United States, alleging for the first time that the trial court's grant of the directed verdict violated his liberty interest under the Fourteenth Amendment to the United States Constitution. *Id.* at A. 73. The Supreme Court denied the petition on April 15, 2019. *Id*. at A. 75.

Petitioner then filed the instant federal habeas corpus Petition on May 14, 2019. ECF No. [1]. The Petition raises one ground:

> The constitutional right to a trial by jury in a civil commitment case cannot be circumvented by a Florida Rule of Civil Procedure, nullifying the inviolate clause of Article I § 22, Florida Constitution, where a liberty interest is at stake under the Fourteenth Amendment of the United States Constitution.

*Id.*

## II.    LEGAL STANDARD

The court's review of a state prisoner's federal habeas corpus petition is governed by the AEDPA. *See Abdul–Kabir v. Quarterman,* 550 U.S. 233, 246 (2007); *Ledford v. Warden, Ga. Diagnostic & Classification Prison,* 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state

criminal justice systems, and not as a means of error correction.'" *Ledford*, 818 F.3d at 642 (quoting *Greene v. Fisher*, 565 U.S. 34, 43 (2011)). This standard is both mandatory and difficult to meet. *White v. Woodall*, 572 U.S. 415, 419 (2014).

The AEDPA provides that a federal court may not grant a habeas petition relief on any claim adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 97-98 (2011)(citing 28 U.S.C. § 2254(d)(1)-(2)); *Rimmer v. Sec'y, Fla. Dep't of Corr.*, 876 F.3d 1039, 1053 (11th Cir. 2017) cert. denied by *Rimmer v. Jones*, 138 S. Ct. 2624 (2018)(accord)).

The AEDPA imposes a "highly deferential standard for evaluating state-court rulings and demands that state court decisions be given the benefit of the doubt." *Renico v. Lett,* 559 U.S. 766, 773 (2010) (quotation marks and citation omitted); *Lee v. Comm'r, Ala., Dep't of Corr.*, 726 F.3d 1172, 1192 (11th Cir. 2013) (citations omitted). The Eleventh Circuit stresses that "federal courts are not to take a magnifying glass to the state court opinion or grade the quality of it."' *See Wiggins v. Sec'y, Fla. Dep't of Corr.*, 766 F. App'x 817, 821 (11th Cir. Mar. 12, 2019) (per curiam) (quoting *Meders v. Warden, Ga. Diagnostic Prison,* 911 F.3d 1335, 1350 (11th Cir. 2019)). Thus, deferential review under § 2254(d) is generally limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster,* 563 U.S. 170, 182 (2011); *Gill v. Mecusker*, 633 F.3d 1272, 1288 (11th Cir. 2011).

To review a federal habeas corpus claim, the district court must first identify the last state court decision, if any, that adjudicated the merits of the claim. *See Marshall v. Sec'y, Fla. Dep't*

*of Corr.,* 828 F.3d 1277, 1285 (11th Cir. 2016). The state court is not required to issue an opinion explaining its rationale, because even the summary rejection of a claim, without explanation, qualifies as an adjudication on the merits which warrants deference. *See Meders v. Warden, Ga. Diagnostic Prison,* 911 F.3d at 1351 citing (*Harrington v. Richter,* 562 U.S. at 100).

If the state court's merits determination is unaccompanied by an explanation, federal courts should "'look through' the decision to the last related state-court decision that does provide a rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers,* 138 S. Ct. 1188, 1192 (2018).

If the claim was adjudicated on the merits in the state forum, § 2254(d) prohibits re-litigation of the claim unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or, (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington,* 562 U.S. at 97-98 (quoting 28 U.S.C. § 2254(d)). A state court decision is "contrary to" established Supreme Court precedent when it (1) applies a rule that contradicts the governing law set forth by the Supreme Court; or (2) confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

An "unreasonable application" of clearly established federal law is different from an incorrect application of federal law. *Id.* at 410 (quoting *Bell v. Cone,* 535 U.S. 685, 694 (2002)). Consequently, "[a] state court's determination that a claim lacks merit precludes federal habeas corpus relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664

(2004)). In other words, if the last state court to decide a prisoner's federal claim provides an explanation for its merits-based decision in a reasoned opinion, "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson*, 138 S. Ct. at 1192. As applied here, to the extent Petitioner's claim was adjudicated on the merits in the state courts, it must be evaluated pursuant to § 2254(d).

The United States Supreme Court has made clear that a decision is an adjudication "on the merits" and still entitled to AEDPA deference when it "addresses some but not all of a defendant's claims." *Johnson v. Williams*, 568 U.S. 289, 298 (2013). "The Supreme Court observed that there are good reasons why state courts do not address every single argument made by a defendant, including 'instances in which a state court may simply regard a claim as too insubstantial to merit discussion.'" *Lee*, 726 F.3d at 1212 (quoting *Johnson,* 568 U.S. at 299). The Supreme Court cautioned that "federal courts have no authority to impose mandatory opinion-writing standards on state courts," and due to the heavy caseload shouldered by many appellate courts, "opinions issued by these courts must be read with that factor in mind." *Lee,* 726 F.3d at 1212 (quoting *Johnson*, 568 U.S. at 299-300).

In any event, this Court is authorized to deny a claim for federal habeas corpus relief when the claim is subject to rejection under *de novo* review, regardless of whether AEDPA deference applies. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (holding federal courts can deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petition will not be entitled to habeas relief if his claim is rejected on *de novo* review); *Connor v. GDCP Warden*, 784 F.3d 752, 767 n.16 (11th Cir. 2015) ("[B]ecause we conclude that Mr. Connor would not be entitled to habeas relief under *de*

*novo* review, we affirm the District Court's denial of relief under that standard without resolving whether AEDPA deference applies.").

The "AEDPA's statutory scheme is designed to strongly discourage" petitioners from presenting new evidence and ensures that "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Cullen v. Pinholster*, 563 U.S. at 185 (quoting *Williams*, 529 U.S. at 437; *Harrington*, 562 U.S. at 103; *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

## III.   DISCUSSION

Determining whether Petitioner is entitled to the relief he requests raises three overarching issues. First, whether the Petition is timely. Second, whether Petitioner has exhausted his state court remedies, and if not, whether he can overcome a procedural default. And finally, whether Petitioner's claim is warranted on the merits. The Court addresses each issue in turn.

### A.   Timeliness

Respondent "concedes" that the Petition is timely filed under 28 U.S.C. § 2244(d). ECF No. [16] at 19. The Court likewise agrees and finds the Petition is timely. The Petition was filed less than one month after the United States Supreme Court denied Petitioner's petition for certiorari on April 15, 2019. ECF No. [17-7] at A. 75.

### B.   Exhaustion

Next, Respondent asserts that Petitioner's claim was not properly raised and exhausted in state court because Petitioner failed to raise his claim in the context of a federal constitutional issue on direct appeal. ECF No. [16] at 22. In his Reply, Petitioner suggests that his brief reference to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in his brief on direct appeal was sufficient to alert the state court to the federal nature of his claim. ECF No. [28] at 1. In addressing the issue of

18

exhaustion and procedural default, the Court must determine whether the claim raised here was raised in the state court proceedings, and whether the state courts were alerted to the federal nature of the claim.

Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all available state court remedies. See 28 U.S.C. §§ 2254(b), (c). To properly exhaust state remedies, the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples,* 489 U.S. 346, 351 (1989); *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 456–59 (11th Cir. 2015).

Exhaustion is not satisfied "merely" if the petitioner presents the state court with "all the facts necessary to support the claim" or even if a "somewhat similar state-law claim was made." *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344-45 (11th Cir. 2004) (citation omitted). A petitioner must instead "present his claims to the state courts such that they are permitted the 'opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Id.* "'Fair presentment' does not mean reciting an oblique reference to Supreme Court precedent and suggesting in the vaguest of terms that the State 'may have' violated it in some unspecified way. Rather, what is required is that the petitioner 'present his claims to the state court such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation. . . . Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick.'" *Taylor v. Dunn*, 14-0439-WS-N, 2018 WL 575670, *37 (S.D. Ala. Jan. 25, 2018) (citing *French v. Warden, Wilcox State Prison*, 790 F.3d 1259, 1270-71 (11th Cir. 2015)).

To overcome the exhaustion requirement, Petitioner must establish that there is an "absence of available state corrective process" or that "circumstances exist that render such process

ineffective to protect [his] rights." 28 U.S.C. § 2254(b)(1)(B); *see Duckworth v. Serrano,* 454 U.S. 1, 3 (1981).

As discussed above, Petitioner made a limited reference to *Apprendi*[3] in his brief on direct appeal, but raised no other arguments regarding *Apprendi* in his state court pleadings, nor did he identify any specific facts supporting his *Apprendi* argument in those pleadings. He then went on to expressly raise the claim that he now raises here for the first time in his petition for writ of certiorari in the Supreme Court: that the state court violated his liberty interest under the Fourteenth Amendment to the United States Constitution by granting the State's motion for directed verdict. Thus, having failed to properly raise his claim in federal constitutional terms in state court, his claim is unexhausted.

### C.     Procedural default

The Court next determines whether Petitioner's failure to exhaust his claim results in a procedural default in federal court. Petitioner's unexhausted claim would now be procedurally barred if raised in the state forum because he has already completed a direct appeal, and thus he cannot return to state court to exhaust his claim of trial court error. *Bailey v. Nagle,* 172 F.3d 1299, 1302-03 (11th Cir. 1999); *see also* Fla. R. Crim. P. 3.850(e)(1) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence.").[4] In this case, a future attempt to exhaust state

---

[3] In *Apprendi*, the Supreme Court held that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. 530 U.S. at 466.

[4] Under the Florida Rules of Civil Procedure for Involuntary Commitment of Sexually Violent Predators, Rule 4.460, which governs habeas corpus petitions in the post-judgment civil commitment context, habeas corpus proceedings brought under the rule are governed by Fla. R. Crim. P. 3.850.

remedies for Petitioner's claim of trial court error would be futile under the state's procedural default doctrine. *Bailey v. Nagle,* 172 F.3d at 1303.

However, a procedurally defaulted claim may still be considered if the federal petitioner can demonstrate (1) objective cause for the failure to properly present the claim and actual prejudice from the alleged constitutional violation, or (2) a fundamental miscarriage of justice. *See Wainwright v. Sykes,* 433 U.S. 72, 87 (1977); *Tharpe v. Warden,* 898 F.3d 1342, 1344–47 (11th Cir. 2018). Petitioner can show cause by alleging that some objective factor, external to the defense, impeded his effort to raise the claim properly in the state court. *See Murray v. Carrier,* 477 U.S. 478, 488, (1986); *Wright v. Hopper,* 169 F.3d 695, 703 (11th Cir. 1999). To show prejudice, a petitioner must demonstrate that the "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." *See McCoy v. Newsome,* 953 F.2d at 1261 (*quoting Murray v. Carrier,* 477 U.S. at 494). The allegations of cause and prejudice must be factually specific, not conclusory. *Harris v. Comm'r, Ala. Dep't of Corr.,* 874 F.3d 682, 691 (11th Cir. 2017).

Here, Petitioner makes no showing of cause and prejudice to excuse the procedural default of his claim raised in the instant Petition. Nor does he attempt to make any showing a fundamental miscarriage of justice by providing new evidence establishing his actual innocence. Accordingly, the Petition is procedurally defaulted. Nevertheless, the Court has reviewed the Petition on the merits, as set forth below, but finds it substantively unavailing.

### D.      The Petition is unwarranted on the merits

In his sole claim,[5] Petitioner alleges that his right to due process under the Fourteenth Amendment was violated when the trial court granted the State's motion for directed verdict before submitting the case to the jury. ECF No. [1] at 5. Respondent submits that the trial court clearly had the authority to enter a directed verdict in favor of the state because the proceedings are civil, and not criminal in nature. ECF No. [16] at 26-36. As such, Respondent argues that Petitioner is not entitled to the same constitutional protections that he would receive in a criminal trial. *Id.*

As previously discussed, after Petitioner rested his case, the trial court granted the State's motion for directed verdict on the record, finding that "no reasonable juror following the law and considering the evidence" could find that Petitioner did not meet the requirements for commitment under the Act. T. 9 at R. 589.

Petitioner raised the issue on appeal, arguing that the trial court judge denied his right to a jury trial by granting the State's motion for directed verdict because neither the statute nor the Act's rules of procedure authorized such a ruling. The Third DCA noted the following in its conclusion affirming his commitment order:

> As the Florida Supreme Court has determined, a Jimmy Ryce proceeding is civil in nature. And while aspects of the Jimmy Ryce Act and the accompanying procedural rules provide certain safeguards which mirror criminal procedures to comport with notions of due process in light of the liberty interests at stake, these additional safeguards do not transform a Jimmy Ryce proceeding from civil to criminal.
>
> Given that the Jimmy Ryce Act and the Jimmy Ryce Rules expressly incorporate the rules of civil procedure (by which either party may seek a directed verdict), and the fact that a motion for directed verdict under the rules of civil procedure is not prohibited or otherwise superseded by any provision of the Jimmy Ryce Act or the Jimmy Ryce Rules, we hold that the trial court has the authority, upon proper motion and showing, to enter a directed verdict in favor of the State or respondent.

---

[5] To the extent that Petitioner raises new facts or claims in his Reply that were not raised in the initial Petition, those arguments will not be considered. A traverse is not the proper vehicle to raise, for the first time, facts to support a ground for relief. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.1994).

We conclude that the trial court, in the instant case, properly directed a verdict in favor of the State.

*Gering v. State*, 252 So. 3d at 340.

The Supreme Court has held that civil commitment proceedings, such as those under the Jimmy Ryce Act, are not criminal in nature. *See e.g. Kansas v. Hendricks*, 521 U.S. 346, 369 (1997); *Allen v. Illinois*, 478 U.S. 364, 374 (1986). Specifically, in *Hendricks*, the Supreme Court held that Kansas's Sexually Violent Predator Act did not violate the double jeopardy and *ex post facto* prohibitions of the Constitution, noting the following:

> Although the civil commitment scheme at issue here does involve affirmative restraint, "the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment." *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987). The State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded. Cf. *id.,* at 747, 107 S.Ct., at 2101-2102. The Court has, in fact, cited the confinement of "mentally unstable individuals who present a danger to the public" as one classic example of nonpunitive detention. *Id*., at 748-749, 107 S.Ct., at 2101-2103. If detention for the purpose of protecting the community from harm necessarily constituted punishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held.

521 U.S. at 363. The Court also noted that "liberty interest is not absolute," and that an "individual's constitutionally protected interest" in liberty "may be overridden," when the individual is "unable to control their behavior and [] thereby pose[s] a danger to the public health and safety." *Id.* at 356-57 (internal citation omitted).

Nevertheless, "[c]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). Accordingly, the confinement must "take[] place pursuant to proper procedures and evidentiary standards," *see Hendricks*, 521 U.S. at 357, 369-71, and as such, due process does not permit civil commitment absent a determination of "current mental illness and dangerousness." *Foucha v. Louisiana*, 504 U.S. 71, 78 (1992). Moreover, while proof beyond a reasonable doubt is not

required, proof by preponderance of the evidence, the general civil standard, falls short of satisfying due process. *See Foucha*, 504 U.S. at 75-76 (citing *Addington*). Thus, the burden of proof for the State must be equal or greater to the "clear and convincing" evidence standard. *Addington*, 441 U.S. at 433.

With this framework in mind, the Jimmy Ryce Act shares many similar traits with Kansas's Sexually Violent Predator Act upheld by the Supreme Court in *Hendricks*. *See Westerheide v. State*, 831 So.2d 93 (Fla. 2002). Particularly, confinement under the Jimmy Ryce Act is "limited to those individuals who are likely to engage in acts of sexual violence if not confinement in a security facility for long-term" treatment." *Id.* at 105. Moreover, the Act provides several procedural safeguards, including the assistance of counsel, yearly mental health examinations, and the right to petition for release. *Id.*

However, although the Jimmy Ryce Act affords the individual the choice of a jury trial, the constitutionality of the Act, and other civil commitment statutes, do not appear to hinge on the right to a trial by jury. *See United States v. Sahhar*, 917 F.2d 1197, 1205-06 (9th Cir. 1990) (holding that the Sixth Amendment right to a jury trial in "criminal prosecutions" is inapplicable to civil commitment proceedings under federal commitment statute); *Poole v. Goodno*, 335 F.3d 705, 709-11 (8th Cir. 2003) ("There is no clearly established Supreme Court law which holds that due process requires a jury trial in civil commitment proceedings"); *McKeiver v. Pennsylvania*, 403 U.S. 428 (1971) (no right to a jury trial in juvenile delinquency proceedings); *United States v. Shields,* 522 F.Supp.2d 317, 338 (D. Mass. 2007) (jury trial is not constitutionally required by the due process clause for civil commitment under the federal Adam Walsh Act). Accordingly, as long as certain procedures are established to address the due process concerns raised by civil commitment proceedings, the right to a jury trial does not appear to be constitutionally required.

Here, although Petitioner chose to proceed to trial before a jury, the court was not precluded from granting the State's motion for directed verdict because, as discussed above, there is no constitutional right to a jury trial in civil commitment proceedings. Rather, the Florida Rules of Civil Procedure apply to civil commitment under the Act. *See* Fla. Stat. § 394.9155(1), and Fla. R. Civ. P. – S.V.P. 4.440(a)(1) ("The Florida Rules of Civil Procedure and Florida Rules of Judicial Administration apply unless otherwise superseded by these rules"). Moreover, like in any other civil case, the State can appeal a jury verdict in favor of the respondent in a Jimmy Ryce proceeding. *See Osborne v. State*, 907 So.2d 505, 507 (Fla. 3d DCA 2005).

Under Fla. R. Civ. P. 1.480, when the trial court has reserved the right to grant a motion for directed verdict, "the court is deemed to have submitted the action to the jury *subject to a later determination of the legal questions raised by the motion*." Fla. R. Civ. P. 1.480(b) (emphasis added). Under Florida law, a motion for directed verdict should be granted only when there is "no reasonable evidence upon which a jury could legally predicate a verdict in favor of the non-moving party." *State v. Shaw*, 929 So.2d 1145, 1147 (Fla. 5th DCA 2006) (citing *Cecile Resort, Ltd. v. Hokanson*, 729 So.2d 446, 447 (Fla. 5th DCA 1999)).

As an initial matter, as argued by Respondent, ECF No. [16] at 29, to the extent that Petitioner argues that the trial court's decision to grant the State's motion for directed verdict was in contravention of the Act, the Florida Standard Jury Instructions for Jimmy Ryce cases, or any other aspect of Florida law, such claims are not cognizable in the instant habeas petition. It is well settled that a state's interpretation of its own rules or statutes does not raise a federal constitutional issue unless it rises to a level of denial of fundamental due process. *See Redman v. Dugger*, 866

F.2d 387, 389 (11th Cir. 1989); *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985); *Carrizales v. Wainwright*, 699 F.2d 1053, 1054-55 (11th Cir. 1983).

The relevant inquiry is whether the Third DCA's decision affirming the grant of the motion for directed verdict was an unreasonable determination of the facts presented such that Petitioner's due process rights were violated, and whether this action was contrary to federal principles of law.

At trial, it was undisputed that Petitioner had previously been convicted of two sexually violent offenses, meeting the first requirement under the Act. T. 5 at 261. Both of the State's witnesses, Drs. Musgrove and Rapa, testified as expert witnesses regarding sex offender evaluations. Dr. Musgrove found that Petitioner suffered from sexual sadism disorder, paraphilia, antisocial personality disorder, and stimulant use disorder. T. 5 at 308. Regarding his likeliness to reoffend, Dr. Musgrove found that Petitioner's sexual disorder was "powerful" and that the fact that he re-offended ten years after raping his first victim, even after receiving treatment, was significant. *Id.* at 309. Musgrove explained that Petitioner's score on the Static 99R test categorized him at a low moderate score for likelihood to reoffend. *Id.* at 392-93. However, he stated that Petitioner's sexual sadism was much rarer than other sexual disorders, and Petitioner did not have the opportunity to re-offend multiple times because he has been incarcerated for most of his adult life. *Id.* at 393. Dr. Musgrove reiterated that the if Petitioner were to be released, the elderly community of South Florida would be at risk, and that he was likely to reoffend. *Id.* at 398-99.

Dr. Rapa testified that she diagnosed Petitioner with sexual sadism disorder, in a controlled environment, unspecified depressive disorder, anti-social disorder, and stimulant use disorder in a controlled environment. T. 7 at 578. She concluded that Petitioner met the SVP criteria. *Id.* at 579. Although Petitioner scored in the low, moderate range on the Static 99R test, it was just one of the factors Dr. Rapa use to determine likelihood of re-offending. *Id.* at 623-24. Dr. Rapa found that

Petitioner presented a danger to the community if he was to be released based on the level of violence and premeditation involved in his prior offenses, *id.* at 633-38, his lack of remorse or insight into his disorder, *id.* at 645, and his accompanying antisocial personality disorder, *id.* at 643, made him likely to reoffend. *Id.* at 648.

As noted, Petitioner attempted to call Dr. William Samek as his sole witness, but the trial court excluded him from testifying as an expert, and Petitioner chose not to present any testimony at all from Dr. Samek. T. 8 at R. 777-81. Petitioner declined to testify. *Id.* at R. 782. The only piece of evidence admitted by the Petitioner was the SVP review report. *Id.* at R. 778.

Based on this evidence, the trial court reasonably determined that there were no conflicts in the evidence such that the case should be submitted to the jury. Specifically, the evidence presented clearly demonstrated that (1) Petitioner had been convicted of sexually violent offenses; and, (2) he suffered from a mental abnormality or personality disorder that made him likely to reoffend. T. 9 at R. 589.

In light of the evidence presented to the trial court, the Third DCA's decision to affirm the trial court's grant of the motion for directed verdict was not an unreasonable determination of the facts presented. Moreover, the Supreme Court has expressly held that civil commitment proceedings are civil, rather than criminal, and there is no principle of federal law that contravenes the state court's actions in the instant case. Consequently, when analyzing the state court's reasoning, the Third DCA's denial of this claim precludes federal habeas corpus relief. *Mitchell v. Esparza,* 540 U.S. 12, 16 (2003); *Wilson v. Sellers,* 138 S. Ct. at 1192. Even assuming the claim was properly exhausted in state court, the state court is entitled to deference under § 2254(d). Petitioner's claim is therefore denied.

### E.    Evidentiary hearing

In a habeas corpus proceeding, the burden is on Petitioner to establish the need for a federal evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011). To determine whether an evidentiary hearing is needed, the question is whether the alleged facts, when taken as true, are not refuted by the record and may entitle a petitioner to relief. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016), *cert. den'd*, 137 S. Ct. 2245 (2017). The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [Petitioner's] claim[s] without further factual development," *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003), Petitioner's request for an evidentiary hearing is denied.

### F.    Certificate of appealability

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal, and to do so, must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *Harbison v. Bell*, 556 U.S. 180, 183 (2009). This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and . . . the district court was correct in its procedural ruling." *Id.* Upon consideration of the record as a whole, the Court denies the issuance of a certificate of appealability.

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Petition, **ECF No. [1]**, is **DENIED**;

2. No Certificate of Appealability shall issue;

3. To the extent not otherwise disposed of, any scheduled hearings are **CANCELED**, all pending motions are **DENIED** as moot, all deadlines are **TERMINATED**; and

4. The Clerk shall **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 21, 2020.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of record

Robert Gering
2218184
Florida Civil Commitment Center (FCCC)
13619 SE Highway 70
Arcadia, FL 34266